**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ecep Han Medikal Tekstil Sanayi Ve Ticaret Limited STI,<br><br>Plaintiff,<br><br>v.<br><br>Nicholas Hammond, et al.,<br><br>Defendants. | No. CV-23-02641-PHX-SMM<br><br>**ORDER** |

Before the Court is Defendants' Motion for Summary Judgment. (Doc. 34). The Motion is fully briefed. (Docs. 46; 62). For the following reasons, the Court grants in-part, and denies in-part, the Motion.

Additionally, before the Court is Defendants' Motion for Sanctions (Doc. 28), Plaintiff's Motion to Strike Defendants' Motion for Sanctions (Doc. 30), and Plaintiff's Motion for Extension of Time to Complete Discovery (Doc. 37). The Motions are fully briefed. (Docs. 31; 32; 39; 40 44; 48). For the following reasons, the Court denies, without prejudice, Defendants' Motion for Sanctions, grants Plaintiff's Motion to Strike, and grants Plaintiff's Motion for Extension of Time.

**I.   BACKGROUND**

In early 2020, the demand for personal protection equipment ("PPE") products, including masks, exploded because of COVID-19. Both being in Afghanistan at that time, Nikmal Abdullah advised Defendant Nick Hammond that he knew people with a large quantity of such masks. (Doc. 35 at ¶ 4). Defendant Hammond then asked Defendant Jon

Picus whether he would like to sell PPE in the United States. (Id. at ¶ 5). The three parties, Mr. Abdullah, Defendant Hammond, and Defendant Picus agreed, verbally, to start selling masks. While no masks were ever sold, they did sell PPE coveralls, manufactured in Turkey by ESBAY, to a company called Rockstar, for distribution in the United States. (Id. at ¶ 6). The product sold were certified to meet FDA requirements by LexaMed, a testing laboratory in Toledo Ohio. (Id. at ¶ 10).

Mr. Abdullah controlled the financials of that first transaction, and the parties agreed he would receive fifty percent of the profits of the deal, while Defendant Hammond and Defendant Picus would split the other fifty percent equally. (Id. at ¶7). After the success of this first transaction, the parties agreed to continue selling Turkish PPE products in the United States. (Id. at ¶ 11).

The parties, for the purpose of continuing the PPE business, formed an Arizona LLC named ECEP Han North America, LLC ("ECEP Han NA"). (Id. at ¶ 12). A corporation, which is now defunct, in which Mr. Hammond served as president and CEO, named RGS Solutions, Inc., represented Mr. Hammond's interest in the partnership. (Id. at ¶ 14). Meanwhile, Mr. Picus participated in the LLC as an individual, and Mr. Abdullah participated through a Turkish company, named ECEP HAN MEDIKAL TEKSTIL SAN VE TIC, LTD. STI ("ECEP Han Turkey").

After forming the LLC, Mr. Picus and Mr. Hammond came under the impression that Mr. Abdullah had misrepresented the profits from the original Rockstar transaction. (Id. at ¶ 17). Mr. Hammond and Mr. Picus sued for their full share of the profits in a Turkish court. (Id.). That case, based on the first transaction, has not yet been resolved. (Id. at ¶ 18).

Prior to this alleged discovery, Mr. Abdullah, through his company, ECEP Han Turkey, shipped multiple containers of PPE goods, including over 213,000 gowns, as part of the second transaction that is the basis of this suit. (Id. at ¶ 19). There was an agreement in place, provided that ECEP Han NA would be licensed to sell goods, manufactured in Turkey, as a distributor for ECEP Han Turkey. Mr. Abdullah, through ECEP Han Turkey, was entitled to a 60% share of profits and losses. (Id. at ¶ 20). The parties also agree that

no purchase order was sent by ECEP Han NA, Mr. Hammond, or Mr. Picus for this shipment. (Doc. 47 at ¶ 23). The parties disagree about other aspects of the transaction.

Defendants, and counterclaimants, Mr. Hammond, Mr. Picus, and Mrs. Picus, claim that there was no agreement, either oral or in writing, that described what particular goods or volume of PPE goods the partnership of ECEP Han NA would purchase for resale, acting as the distributor under the agreement. (Doc. 35 at ¶ 21). Nor was there any agreement on price that ECEP Han NA would pay for each PPE garment. (Id. at ¶ 22).

Plaintiff, ECEP Han Turkey, claims that the shipment was made at Defendants' request, and with their personal guarantee. (Doc. 47 at ¶ 20). Further, Defendants state that the parties had ongoing discussions on the types and volumes of PPE goods that ECEP Han Turkey would produce and sell to ECEP Han NA. (Doc. 47 at ¶ 21). While ECEP Han Turkey agrees that a purchase order was not sent, ECEP Han Turkey states that shipment invoices were sent and accepted, and such invoices broke down the products and pricings in its invoices, that were received and accepted by Defendants. (Doc. 47 at ¶ 22-23). Defendants deny both the validity of the line items in the invoice, and that it serves as proof of a transaction. (Doc. 34 at 9).

There is additionally disagreement as to the quality of the PPE products. Defendants state they were falsely led to believe that the products would be manufactured by ESBAY, who produced the earlier shipment, or that the PPE products would at least be of a-like quality to those previous products. (Doc. 35 at ¶ 25). Plaintiff states that Defendants knew that the products would not be produced by ESBAY, nor was there any guarantee to be of a-like quality. (Doc. 47 at ¶ 25). The products were not manufactured by EBSAY, and there is a disagreement as to its merchantability. (Doc. 35 at 27; Doc. 47 at p 27).

To note, the parties disagree about the level of protection that the gowns were intended to provide. The Advancement of Medical Instruments ("AAMI") has a rubric that provides for four different levels of protection when grading surgical gowns. NIOSH Personal Protective Equipment Information, Center for Disease Control and Prevention, https://wwwn.cdc.gov/PPEInfo/Standards/Info/ANSI/AAMIPB70Class3.   While

Defendants believed the gowns were promised to be AAMI level four, Plaintiff asserts that no such guarantee was made. (Doc. 35 at ¶ 45; Doc. 47 at ¶ 38).

Once the product arrived in Florida, Mr. Picus and Mr. Hammond sent ECEP Han Turkey, from the ECEP Han NA bank account, an initial payment of $50,000, towards what Plaintiff states was a $972,000 purchase price, stating they were under the belief that the products were produced by EBSAY. (Doc. 35 at ¶ 28; Doc. 47 at ¶ 28). Mr. Picus sent an email, dated April 5, 2021, offering installment payments, which Defendants state was contingent on the test results. (Doc. 35 at ¶ 29). Plaintiff denies that Defendants' personal guarantee was ever contingent on test results. (Doc. 47 at ¶ 29).

Defendants then began attempting to sell the products. (Doc. 35 at ¶ 33). The attempts were unsuccessful. Plaintiff states that Defendants were unable to do so due to the unexpected overflow of PPE products in the United States. (Doc. 47 at ¶ 32). Defendants state that it is necessary for customers of PPE to receive certifications from United States laboratories before they will purchase products, and therefore the lack of such certifications caused Defendants to be unable to sell the products. (Doc. 35 at ¶ 47).

Defendants state that some of the products were found to be mislabeled, with incorrect sizing on the packages and boxes, after failing certain AAMI test level standards. (Id. at ¶¶ 39; 41). Defendants state that correct sizing is an element of FDA requirements. (Id. at ¶ 40). Further, Defendants state that the Flammability performance labels, required by CFR 16 Part 1610 were missing from the garments. (Id. at ¶ 42). Plaintiff disagrees with these alleged short comings and does not find them to be relevant as to the merchantability of the goods. (Doc. 47).

Defendants state that Mr. Abdullah hand-picked samples to be sent to Defendants' office for testing, as well as LexMed's laboratory for further testing. (Doc. 35 at ¶ 43.) According to Defendants, these samples failed to meet the AAMI protection level stated on the package. (Id. at ¶ 44). Mr. Picus personally sent the product to LexaMed for testing but was notified that upon visual inspection the material was deficient, and further testing would be a waste of resources (Id. at ¶ 46). Further, other sales reps and potential customers

allegedly returned the product or refused to order. (Id. at ¶ 47).

Plaintiff brought suit in Arizona state court, and the action was removed to this Court. (Doc. 1). Plaintiff's Complaint asserted four causes of action: (1) Breach of Contract and the Implied Covenant of Good Faith; (2) Breach of Personal Guarantee; (3) Breach of Fiduciary Duties; and (4) An Accounting. (Doc. 1 at 4-8). Defendants countersued, asserting claims of (1) Breach of Contract; (2) Breach of Fiduciary Duties; (3) Breach of Implied Covenant of Good Faith; and (4) Fraud, Misrepresentation. (Doc. 2 at 17-28).

## II.     LEGAL STANDARD

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion [ ] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## III.    SUMMARY JUDGMENT ANALYSIS

### A. MEDIATION CLAUSE

Defendants assert that Plaintiff breached the Disputed Matters Clause, or the meditation clause, of ECEP Han, NA's Operating Agreement, the breach was material, and as such, releases Defendants from their duty to perform. (Doc. 34 at 11-13). It is undisputed that the Operating Agreement contained the following clause:

> Disputed Matters. In regard to any disputed matters relating to this Agreement, other than a voting deadlock which is governed elsewhere in this Agreement, the Members agree to first attempt to resolve any dispute first by face-to face or online video discussion in good faith between the parties. If such discussion fails then, any dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall first be submitted to mediation in Arizona paid for by the

>Company. The number of mediators shall be one and chosen by a Majority vote. If no settlement is reached amicably between the parties, the dispute may be litigated in a court of law in Arizona.

(Doc. 35 at Exhibit 19); (Doc. 46 at 3).

Plaintiff does not dispute that the clause requires meditation to be conducted in good faith before engaging in litigation, however, Plaintiff asserts that this requirement has been met, or in the alternate, Defendants have waived the defense at this point of the proceedings. (Doc. 46 at 4-7).

After the parties selected ark Garfinkel, Esq. to serve as a mediator, Mr. Abdullah choose to represent ECEP Han, Turkey himself, rather than retaining counsel. (Doc. 34 at 9-10). Defendants state that they submitted a 115-page brief to Mr. Garfinkel in August of 2022, while Mr. Abdullah "dumped hundreds of miscellaneous records on the meditator without submitting a brief before he abandoned the meditation." (Id.). Further, Defendants assert that they were cut off from the Turkish server where all company documents were stored. (Doc. 34 at 9). Defendants interpret these actions as demonstrating a lack of good faith on the part of Plaintiff in engaging in the meditation process, requiring a dismissal of this lawsuit. (Id.).

In the Settlement Conference settings, courts have recognized that appearing in "good faith" means, in part, appearing with representatives who possess "full and complete settlement authority." Pitman v. Brinker Int'l, Inc., 216 F.R.D. 481, 486 (D. Ariz. 2003); see also, Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1396 (9th Cir. 1993) (upholding district court's sanctions where party appeared at conference represented only by single attorney lacking settlement authority and no one was available by telephone with settlement authority). There was no provision of the Disputed Matters clause that required parties to be represented by an attorney, and Mr. Abdullah had "full and complete settlement authority," along with a knowledge of the events leading to the dispute. Therefore, Mr. Abdullah representing ECEP Han, Turkey in the meditation does not demonstrate a lack of good faith.

Further, Plaintiff refutes Defendants' assertion that Plaintiff did not file a brief to

Mr. Garfinkel, attaching to their Contravening Statement of Facts Exhibit J, which shows a memo, addressed to Mr. Garfinkle, dated July 27, 2021. (Doc. 47 at Exhibit J). Although it was significantly shorter than Defendants' memo, the Court cannot find an absence of good faith on this basis.

The purpose of a settlement conference—as the court noted in Pitman—is to allow the parties an opportunity to meet "with an open mind and a genuine willingness to meaningfully discuss the strengths and weaknesses of each party's case." Pitman, 216 F.R.D. at 485. Meditation aims at a similar end. The success of meditation talks has no bearing on whether a party has participated in good faith. Whether Plaintiff abandoned the meditation talks early is an open question, but the rest of the factual record does not demonstrate a lack of good faith. The Court does not find there is a lack of a genuine dispute as to whether Plaintiff participated in the mediation in good faith. Therefore, the Court will deny Defendants' Motion for Summary Judgment so far as it asserts that the Complaint should be dismissed for a breach of the Disputed Matters clause of the Operating Agreements.

**B. Good faith**

Mr. Abdullah's declaration admits that Defendants "attempted to sell the products in good faith. (Doc. 47 Exhibit A at ¶ 11). Therefore, Plaintiff's claims, in so far as they assert that Defendants failed to act in good faith in attempting to sell the product, must be dismissed.

**C. Whether the goods were ordered**

Defendants argue that ECEP Han, NA never actually ordered the goods from Plaintiff and therefore Defendants cannot be held liable for non-payment. (Doc. 34 at 13). The Operating Agreement for the LLC required manager authorizations for expenditures or contractual commitments on behalf of the Company ("ECEP Han NA") in excess of $5,000. (Doc. 1-1 at 29). It is asserted that no such authorization was provided here. (Doc. 34 at ¶ 5).

Plaintiff points towards the email sent by Mr. Picus, where he stated that Mr.

Hammond and himself appreciated Mr. Abdullah's trust and "the risk in financing the containers that we received these past few months." (Doc. 47-9). Further, Mr. Abdullah's Declaration asserts several levels of communication regarding the transaction before the shipment. (See Doc. 47 at Exhibit A).

Defendants are correct in pointing out the unorthodox nature of the transaction, given the lack of purchase order, or a term sheet describing the goods, price, and payment terms before shipment. (Doc. 62 at 5). The paper trail for the transaction, outside of the emails between parties, is limited to the invoice attached to the Complaint. (Doc. 1-1 at Exhibit C). That invoice lists ECEP Han NA as the "Client," an outstanding balance of $970,061.85. (Id.).

Arizona law provides that a buyer may accept, reject, or reject in part any goods or delivery that does not conform to the sales contract. A.R.S. § 47–2601. To reject all or part of the goods, a buyer must do so "within a reasonable time after their delivery" and must seasonably notify the seller. A.R.S. § 47–2602(A). A buyer is relieved of all obligations for goods rightfully rejected. A.R.S. § 47–2602(B)(3). Conversely, by accepting delivered goods, a buyer waives any claim that those goods did not conform to the contract. Pac. Am. Generations Ranch, LLC v. Zarbock, No. 1 CA-CV 10-0771, 2012 WL 161814, at *5 (Ariz. Ct. App. 2012) citing Leasing Corp. v. S.P.E. Bldg. Sys., Inc., 730 P.2d 273, 277–78 (Ariz. Ct. App. 1986).

Here, the parties disagree as to whether the goods conformed to the agreement between the parties. (See Section III D). However, even if the goods did not conform, ECEP Han NA may have still accepted the good, and thus bound themselves to the contract, if they did not reject and notify ECEP Han Turkey of their rejection in a "reasonable" amount of time.

What constitutes a "reasonable opportunity" for inspection depends on the circumstances of the particular case. A.R.S. § 47–1205(A) (Supp.2010). The determination is typically a question of fact. Generations Ranch, LLC, 2012 WL 161814 (Ariz Ct. App. 2012), at *6, citing G & H Land & Cattle Co. v. Heitzman & Nelson, Inc., 628 P.2d 1038,

1042 (Idaho 1981) (collecting cases). Defendants did have the duty, themselves, to inspect the goods upon receiving them. A.R.S. § 47–2513(B) (providing that "[e]xpenses of inspection must be borne by the buyer but may be recovered from the seller if goods do not conform and are rejected"); Heil–Quaker v. Swindler, 255 F.Supp. 445, 449 (D.S.C. 1966) (holding that duty on buyer to inspect goods after given a reasonable opportunity to do so).

The question as to whether Defendants rejected the goods in a reasonable time is not ripe for a Summary Judgment Motion. Certain parts of the record weigh against Defendants arguments, preventing the Court from finding that there is a lack of a genuine dispute of fact on the issue.

For one, Plaintiff details the efforts they took to sell the goods. In their Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment, Defendants state "the MSJ moving papers provide testimony backed by documentary evidence of the *extraordinary* efforts made by Defendants to sell the Turkish goods." (Doc. 62 at 10) (emphasis added). Efforts to sell goods received is evidence of acceptance. See Pace v. Sagebrush Sales Co., 560 P.2d 789, 791 (Ariz. 1977) (finding acceptance where buyers took possession of the goods, put them in its inventory, offered them for sale to the public, and sold a portion of the goods).

Further, Mr. Picus' email offering a payment schedule for the shipment weight for the acceptance of the shipment. See McCormick v. Ornstein, 580 P.2d 1206, 1209 (Ariz. Ct. App. 1978) (concluding that buyer accepted a trailer when he offered to pay the balance of the written contract price on the assumption that he could have the trailer repaired).

The Court finds that it is not clear whether ECEP Han NA's Operating Agreement's provision on a vote being necessary to approve transactions over $5,000 was satisfied. (Doc. 62 at 5). This could give credence to the assertion that the goods were not purchased. However, as Defendants offer no evidence to show that the Operating Agreement was *not* satisfied, and as they only now bring the argument to the fore in litigation, and not in the prior emails provided to the Court, the Court does not find it proper to find that no transaction was entered into due to the lack of evidence of the Operating Agreement being

complied with at this time.

Given Defendants' efforts to sell the product, Defendants' agreements to set up a payment plan with Plaintiff, and the lack of information known on whether the terms of the Operating Agreement have been satisfied, the Court finds it improper at this time to grant Defendants' Motion for Summary Judgment. It is noted that the Court does not find at this time that Defendants did accept the offer. Nor does the Court articulate a finding on whether Defendants properly revoked their acceptance. See § A.R.S. 47–2608 (stating that a buyer may revoke his acceptance of a good when his "acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances."). The Court, at this time, cannot find an absence of a genuine dispute of material fact in so far as to whether Defendants accepted the contract.

**D. Merchantability**

The Court finds that the question of merchantability cannot be resolved at the Summary Judgment stage, as it is not clear what exactly the intended product the parties formed the contract to exchange. Defendants point to the prior transaction that provided gowns with a higher level of protection than those in the instant case and communications between Defendants and Plaintiff where Plaintiff sent promotional material from EBSAY, which manufactured the product in the original case, but not in the instant case. However, with the lack of evidence surrounding negotiations regarding the current transaction, as the record currently stands, there is an open question as to whether Plaintiff ever made assurances that the products would pass level 4 AAMI testing. Plaintiff correctly points out that there are different uses of the gowns for different levels of testing, and what may be unmerchantable for one use, would be satisfactory for another.

As such, the Court finds that there is a genuine issue of material fact over whether the goods that were provided were merchantable within the bounds of the agreement between the parties. Fed. R. Civ. P. 56(c). This is a quintessential question of fact, not to be determined at the Summary Judgment stage of the case.

///

**E. Personal Guarantee**

Count II of Plaintiff's Complaint asserts that Defendants sent a letter of personal guaranty, pledging to personally guaranty ECEP Han NA's debt for the shipping containers sent by paying $100,000 a month, until the debt was settled in full. (Doc. 1-1 at 5). Defendants assert that this does not constitute a personal guaranty, and in the alternate, the guaranty is only binding on Defendant Picus, as Defendant Hammond did not write the email, nor was he consulted before the email was sent. (Doc. 34 at ¶ 32).

The Court finds that there is a question of fact as to whether Defendant Picus' alleged personal guarantee was contingent on the gowns passing certain test results. When reading the email that Plaintiff asserts "we will start making payments this Thursday, August 8 . . . [w]e will continue making these payments each month until the debt is settled. (Doc. 1-1 Exhibit B). The email goes on to state that without the proper certification, Defendants would be unable to sell the gowns. (Id.). However, it does not make the first statement, made in no uncertain terms, contingent on these results. Plaintiff meets the burden of production to show that there is a genuine issue of material fact as to whether this functions as a personal guarantee. However, Defendant Hammond did not sign the email in question, which is the only piece of evidence that Plaintiff advances to show a personal guarantee has been made. (Id.).

Further, however, an enforceable contract requires "an offer, an acceptance, consideration, and sufficient specification of terms so that obligations involved can be ascertained." Sadeghi Holdings LLC v. Majaly, No. 1 CA-CV 21-0314, 2022 WL 401162 (Ariz. Ct. App. 2022) citing K-Line Builders, Inc. v. First Fed. Savs. & Loan Ass'n, 139 Ariz. 209, 212 (Ct. App. 1983). The 11th circuit has explicitly held that new consideration is required in a guaranty contract, when it is executed after a principal obligation has been established. Lenbro Holding Inc. v. Falic, 503 F. App'x 906, 908 (11th Cir. 2013). Although out-of-circuit, this is the clear application of basic Arizona contract law to a situation where a member of an LLC personally guarantees the debt of an LLC to a third party.

Therefore, if Defendant Picus was to be bound by the alleged personal guarantee made to Plaintiff, Picus would have had to receive some consideration in exchange for the guarantee. There is no such consideration contemplated in the Complaint, or in Plaintiff's Response to Defendants' Motion for Summary Judgment. (Docs. 1; 46). The April 5 email in question was sent after the goods had already been shipped, which means that the shipment of the goods cannot serve as the necessary consideration.

As there is no consideration, the personal guarantee allegedly made by Defendant Picus is not enforceable against him. Therefore, both Defendant Picus and Defendant Hammond are not liable under a theory of personal guarantee. Count II, for breach of the personal guarantee will be dismissed.

### F. Relived from Duty to Account

Count IV of Plaintiff's complaint asserts that Ecep Han Turkey requested access to Ecep Han NA's financial records and accounts, and an accounting of the Company's capital contributions, assets, liabilities, revenues, and profits, and Defendants did not respond to the requests. (Doc. 1 at 20). Defendants state that they are relieved from the duty to provide the accounting, as their access to the server was cut off by Plaintiff. (Doc. 34 at 18). Plaintiff did not respond to this argument in its Response to Defendants' Motion for Summary Judgment.

A party's failure to respond to arguments in a motion "may be deemed consent to the denial or granting of the motion and the Court may dispose of the motion summarily." LRCiv 7.2(i). Therefore, the Court will consider Defendants' argument that they are relieved from their duty to account to be consented to by Plaintiff. Accordingly, the Court grants Defendants Motion for Summary Judgment as to the duty to account and will dismiss Count IV from Plaintiff's Complaint.

### IV.  MOTION FOR SANCTIONS AND MOTION TO STRIKE

Defendants moved the Court to issue sanctions against Plaintiff "for intentional destruction of, and the failure to, preserve electronically stored information in anticipation of and in the conduct of litigation, which cannot be restored or replaced through additional

discovery, causing irreversible prejudice to the moving parties." (Doc. 28 at 2).

The Motion revolves around certain emails, on the ECEP Han Turkey servers, that Defendants claim were deleted, in an effort to prejudice Defendants in this case. (See Doc. 28). Plaintiff, while denying the factual basis of the Motion, move the Court to strike the Motion, as Defendants failed to confer with Plaintiff before the filing of the Motion. (Doc. 30).

Plaintiff does not believe that this Motion involves discovery, but rather disclosures, and therefore is not subjected to 7.2(j) LRCiv. That rule, provides:

> No discovery motion will be considered or decided unless a statement of moving counsel is attached thereto certifying that after personal consultation and sincere efforts to do so, counsel have been unable to satisfactorily resolve the matter. Any discovery motion brought before the Court without prior personal consultation with the other party and a sincere effort to resolve the matter, may result in sanctions.

The Court finds that Defendants' Motion does involve discovery. Although Defendants claim that the emails should have been included in the initial disclosures, Defendants demanded the emails in a request for production. (Doc. 28 Exhibit B1). Therefore, the issue falls within the umbrella of discovery disputes, that require meet and confers before filing of a motion. Although the demand for production stated that it served as the meet and confer for the issue, given the time between the email in late March 2024, and the filing of the Motion in December 2024, along with the asserted access to the emails provided shortly after the demand (see Doc. 30), the Court finds that Defendants failed to meet their obligations to meet and confer.

In the interest of facilitating a resolution without Court involvement, the Court will deny Defendants' Motion for Sanctions, without prejudice, for failure to satisfy the meet and confer requirement of the local rules. Accordingly, the Court will grant Plaintiff's Motion to Strike. If, after consultation between parties, Defendants still wish to bring their Motion, they may, and the Court will set a hearing to resolve the matter.

///

///

## V. MOTION FOR EXTENSION OF TIME

The Court issued an Order, after a status hearing in this case, staying discovery in this matter until the resolution of the Summary Judgment Motion. The Court stayed consideration of Plaintiff's Motion for Extension of Time, which Defendants contest.

The Court will grant Plaintiff's Motion and extend the deadlines in this matter. The Court does so to facilitate a just resolution of the case. Although the Court notes that Plaintiff's Motion was filed on the standing deadline for the close of fact discovery, the Court also recognizes the issues in this case with setting deposition dates, especially considering the international parties involved.

As the Motion for Sanctions is at this time denied, the Court will not open discovery into the spoilation issues. If Defendants wish to refile their Motion for Sanctions, after a meet and confer, and wish to move the Court to allow limited discovery into the Spoilation issue, Defendants should file a motion with the Court to allow such discovery.

For good cause shown,

**IT IS ORDERED granting in-part, and denying in-part**, Defendants' Motion for Summary Judgment. (Doc. 34).

**IT IS FURTHER ORDERED dismissing** Plaintiff's claims in so far as they assert that Defendants failed to exercise good faith in the performance of their duties to sell the goods in question.

**IT IS FURTHER ORDERED dismissing** Count II of Plaintiff's Complaint.

**IT IS FURTHER ORDERED dismissing** Count IV of Plaintiff's Complaint.

**IT IS FURTHER ORDERED denying** Defendants' Motion for Sanctions, without prejudice. (Doc. 28).

**IT IS FURTHER ORDERED granting** Plaintiff's Motion to Strike Defendants' Motion for Sanctions. (Doc. 30).

**IT IS FURTHER ORDERED granting** Plaintiff's Motion for Extension of Time to Complete Discovery. (Doc. 37).

**IT IS FURTHER ORDERED resetting** the deadline for fact discovery to

November 14, 2025.

**IT IS FURTHER ORDERED resetting** the deadline for Plaintiff's Disclosure of Experts to November 21, 2025.

**IT IS FURTHER ORDERED resetting** the deadline for Defendants' Disclosure of Experts to December 19, 2025.

**IT IS FURTHER ORDERED resetting** the deadline for Expert Depositions to January 16, 2025.

Dated this 19th day of September, 2025.

_____
Stephen M. McNamee
Senior United States District Judge